# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 24, 2014 Session

## STATE OF TENNESSEE v. JAMES CODY BURNETT

**Appeal from the Criminal Court for Knox County**
No. 95309     Steven Sword, Judge

---

**No. E2013-01369-CCA-R3-CD - Filed September 3, 2014**

---

The Defendant, James Cody Burnett, pleaded guilty to one count of vehicular homicide by intoxication with an agreed sentence of eight years and the manner of the service of the sentence to be determined by the trial court. After a hearing, the trial court ordered the Defendant to serve his sentence in confinement. The Defendant filed a Rule 35 motion to reduce his sentence, which the trial court denied. The Defendant filed an appeal of both the trial court's sentence of confinement and its denial of his Rule 35 motion to reduce his sentence. We consolidated those two appeals. After a thorough review of the record and applicable authorities, we affirm the trial court's sentencing of the Defendant and its denial of his motion to reduce his sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Mark E. Stephens, District Public Defender, and Robert C. Edwards, Assistant Public Defender, Knoxville, Tennessee, for the Appellant, James Cody Burnett.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kenneth F. Irvine, Jr., and Leland L. Price, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a vehicular collision that occurred on December 8, 2009. A

Knox County grand jury indicted the Defendant for one count of vehicular homicide by intoxication, one count of vehicular homicide by reckless driving, two counts of driving under the influence ("DUI"), one count of failure to maintain a lane of traffic, one count of failure to provide proper evidence of financial responsibility, one count of violation of the safety belt law, one count of violation of the state registration law, and one count of failure to carry a vehicle certification of registration. Pursuant to a plea agreement, the Defendant entered a guilty plea to one count of vehicular homicide by intoxication, a Class B felony, in exchange for a sentence of eight years and for the other charges against him being dismissed.

## A. Guilty Plea Submission Hearing

At the guilty plea submission hearing, the Defendant's counsel noted that, as a result of this accident, the Defendant had sustained serious injuries and was hospitalized for approximately sixty days. The Defendant's injuries included head trauma, which resulted in some short-term memory loss. Counsel stated that the Defendant was competent to enter the guilty plea.

The State informed the trial court that, had the case gone to trial, the evidence would have shown:

> That on December 8th of 2009 at around 7:50 in the morning, actually, shortly before that, [the Defendant] was driving northbound on Maynardville Highway. Just before the highway narrows to two lanes, there's a stop light. He had stopped at that stop light. We do have a witness who saw him there. He had fallen asleep at the stop light to the point where the traffic that had backed up behind him began circling around him, [after] the third or fourth car that had circled around him, he woke up and continued to drive northbound on Maynardville Highway.
>
> He proceeded for about half a mile down the road and then appeared to fall asleep again. His car began to drift within his lane and then went into – at this point there's two lanes – the oncoming southbound traffic. The first car was able to avoid him. The second car did not have enough time to get out of his way. That car's driver was named Dawn Reynolds.
>
> Ms. Reynolds' car took the impact on her driver side door of the car driven by [the Defendant], and she died instantly as a result of that car hitting. She essentially took all that force of his car hitting her directly on her side of the car. She did die at the scene as a result of her injuries. They were not able

to revive her at the scene.

[The Defendant] gave a blood sample. The results of that blood sample came back as containing methadone in the amount of .13 micrograms per milliliter. This is a drug that [the Defendant] – we were going to prove to you that he has been on for a number of years. He's aware of its side-effects. However, he is also aware or should have been aware that he shouldn't have mixed it with promethazine. There's [sic] a bottle of promethazine next to him in the car. It's actually prescribed to who we believe was his girlfriend. The amount of promethazine in his system was .14 micrograms per milliliter.

As a result of these two drugs mixing – and there are a couple of other drugs, but those were administered by the EMTs. As a result of these two drugs being in his system . . . it caused him to be so sleepy that he fell asleep behind the wheel of a car.

The Defendant testified that he had achieved a GED and that he was twenty-six years old. He had the ability to read and write. The trial court explained to the Defendant his rights and the potential sentences he faced. The trial court then accepted the Defendant's guilty plea.

## B. Sentencing Hearing

The State offered the testimony of Maudie Ward, the victim's mother, who said that she was now raising the victim's children since the victim's death. The death of the victim, who was her oldest child, "has almost destroyed [her] life." Ms. Ward said that, additionally, the victim's death had been extremely hard on the victim's children. The victim's son told Ms. Ward that he could not sleep because he kept dreaming about his mother. He further said that he wanted to be with his mother. Ms. Ward said that the victim was the sole provider for her children and that she was on her way to work to provide for them when she was killed. In light of the fact that the Defendant was using controlled substances at the time of the accident, Ms. Ward asked the trial court to sentence the Defendant to the most severe punishment possible.

The victim's father, Sam Ward, testified that the victim's body was so mangled after the accident that the funeral home employees told the family not to touch the body. Mr. Ward said that the victim's hands had to be held together with special gloves. Mr. Ward also said that one of the victim's daughter's birthday was on the day of the accident, and he said that the victim's death had significantly impacted this daughter, hurting her "quite a bit." Mr. Ward said that the family was "making it" and asked that the "best be done."

April Baer, the victim's sister, testified and asked that the trial court give the Defendant the most severe possible punishment for killing her sister. Ms. Baer said that her sister's body was so traumatized, it could not be embalmed. The victim's body had bruising and there were lacerations covering her face. She said that the victim was the mother of three beautiful children. Ms. Baer said that the victim's death had devastated her family.

The State offered the presentence report and the TBI report analyzing the Defendant's blood sample, along with a treatise that helped explain the level of "promethazine" in the Defendant's system. The State also offered records from the methadone clinic where the Defendant was being treated for his addiction issues.

The State asked the trial court to order that the Defendant serve his sentence in confinement. The State noted that there were three substances in the Defendant's system at the time of the accident. The first substance was methadone, which he was using to treat a heroin addiction. The second substance was cough medicine. The third substance was promethazine, which was proscribed to his girlfriend to address her morning sickness. The State noted that the Defendant was aware that the methadone could cause drowsiness. Further, he was aware that the use of methadone in combination with other narcotics or other sedatives could cause undesirable side effects.

The State informed the trial court that one of the exhibits showed that the Defendant had a history of not complying with the methadone clinic. He tested positive for oxycodone in February 2008. He was placed on "relapse prevention," but he tested positive for oxycodone again in June and August 2009. The Defendant had also failed to show up for his "medication count," which is a requirement of the methadone program.

The State noted that the Defendant had a long history of drug abuse, dating back to his middle school years. He had used different types of drugs, getting progressively worse, and he had previously failed to comply with a sentence involving release into the community. The Defendant had not paid his fine and costs on a conviction for failing to show his driver's license. The State argued that the Defendant had no hesitation about committing a crime when the risk to human life was great, in that he was aware that he was sleepy, that he had been sick, and that methadone causes drowsiness.

The Defendant's counsel offered a report showing that the Defendant had been drug tested seven or eight times since the car accident and each time his test was "clean." Counsel said that the Defendant had been working on inventory at Home Depot the night before this accident. He was sick but did not want to miss work. He took cough medicine and his wife's phenergan, which is a non-convulsant used to combat morning sickness. Defense counsel

noted that this case was entirely different from one where a defendant was at a bar or a restaurant drinking beers before driving. The Defendant took medication in order to be able to work. Defense counsel said he was unsure whether the Defendant understood that taking phenergan was the same as taking a narcotic with his methadone. Defense counsel stressed that the Defendant was not a man who was taking medication to have fun or to party but instead so that he could work. Defense counsel explained that the Defendant had taken oxycontin in 2009 and 2010 as a result of breaking "every bone in his body." He said that the Defendant was not on drugs and was "clean."

Defense counsel discussed the Defendant's limitations, including brain damage, short-term memory loss, difficulty breathing, and speech impediments. As a result of his injuries, the Defendant had applied for social security disability and had undergone two psychological evaluations. An administrative law judge had found the Defendant "totally disabled." Defense counsel said that the Defendant showed a potential for rehabilitation.

Based upon this evidence, the trial court sentenced the Defendant as follows:

The only issue that we're dealing with here today is not the length of the sentence, but the manner that it'll be served, and the legislature tells us, "To implement the purposes of this chapter the following principles to apply. Sentences involving confinement should be based on the following considerations: confinement is necessary to protect society by restraining a defendant who has a long . . . history of criminal conduct. Confinement is necessary to avoid depreciating the seriousness fo the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or C, measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant," and then they give us some additional considerations in all sentencing.

"The . . . sentence imposed should be no greater than that deserved for the offense. Inequalities that are related to any purpose other than this chapter should be avoided. The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and then you consider the potential, lack of potential for rehabilitation or treatment of the defendant, and also we're encouraged to use alternatives to incarceration, including requirements of reparation, victim compensation, or community service.

And so that's sort of the overriding principles that the Court has to consider, and one of the things that usually we look at, enhancement factors

and mitigating factors, to determine the appropriate length, but it also plays some role into the manner of service, and both sides have pointed to some of the enhancement and mitigating factors that have been set forth by the legislature. So let me address those now.

First, the [S]tate relies on enhancement factor No. 1 that says the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. We all agree that [the Defendant's] a range I standard offender. So any convictions or criminal behavior would fit into that category. His criminal history is minor as far as the courts are concerned. He had that prior no driver's license in '06 which is not . . . considered a serious offense, and then I believe he had a juvenile shoplifting. They may have gone through first offender or something on it. So prior to this, his legal criminal history was minimal.

Now, the [S]tate makes a good argument that [this factor] involves criminal conduct as well, and by [the Defendant's] own admissions, he does have a history of criminal conduct of using a controlled substance. Started out with marijuana at a young age, then got hooked on the Oxys and Roxys, and that is significant, in my opinion, and does play some role. I don't know how much from the perspective as an enhancement factor as it does just in considering the facts and circumstances of this particular case, and how that plays into the sentencing principles. So I do think that is something to be considered.

I'll also point out that [the Defendant], although he did seek treatment on his own, which as his attorney said is commendable and is rare in this society, but then he did have a relapse . . . on February 20th, 2008, he was positive for oxycodone, and then this wreck I believe occurred on . . . December 8th of 2009. So within . . . a year of that. Apparently, he'd been clean before. So I think that there is some significance that he continued to engage in criminal behavior. I'm not sure how much weight that's entitled to . . . but . . . it does play some role in the general sentencing principles concerning the circumstances of this case.

And then the [S]tate also points to enhancement factor No. 10 that says a defendant had no hesitation about committing a crime when the risk to human life was high. I think at the time that [the Defendant] was ingesting these substances, he probably did not see that as committing a crime. I think

the Attorney General's probably right, when . . . he should have known the effect these substances were having on him and certainly when he was asleep at the stop light, but I don't think that that enhancement factor carries any weight here, to me. . . .

Now, the defense cites some mitigation starting with No. 6, that . . . "The defendant, because of youth or old age, lacks substantial judgment in committing the offense." He was 23 at this time. With his minor criminal history, I guess you'd look at that and say he was young, but I think his history indicates that he didn't lack a maturity in this area. [The Defendant] had been using controlled substances for years at this point and knew what negative effects it had on him, and so I think he had a greater knowledge at age 23 than many adults have much older than him concerning the effect of these substances that he ingested, and so I don't think that mitigation factor is entitled to much, if any, weight at all, 'cause I think he knew. He's more experienced than most.

And then the defense cites No. 11 that says, "The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it's unlikely that a sustained intent to violate the law motivated the criminal conduct." In this case, you know, usually criminal offenses, somebody is engaging in intention[al] and knowing behavior, as far as wanting to commit an offense, and I don't think there's any evidence that [the Defendant] intended to cause this wreck to kill [the victim], and so, yes, he was intentionally and knowingly taking these substances, but I don't think it rises really to the level of somebody engaging in conduct that they thought at the time was necessarily criminal. It certainly affected his judgment and his ability to . . . decide on whether or not to drive, but I think that mitigation factor does apply and is entitled to some weight.

And then there's a catch-all, 13, that says, "Any other factors consistent with the purposes of this chapter," and the defense has cited the severe physical injuries that [the Defendant] has suffered in this. That's a difficult one for the Court to weigh. I think it is entitled to some degree of mitigation in that how he performs in a prison setting or how he'd perform on probation certainly could be affected by both his physical injuries as well as the personality change, and as [defense counsel] points out, sending him to the penitentiary could result in him suffering even greater harm because of his personality issues. So I think that probably the physical injuries are entitled to some degree of mitigation. I'm not sure that it weighs very heavily in my

-7-

thinking on this, and I'll address that again here at the conclusion of my ruling.

And then the defense cites the [D]efendant's family. His children live with him and his grandmother. I'm not really sure how that plays into a role of mitigation. I'm sure they want him there, but I fail to see how that mitigates in any way this case, and they point out that he has support of family and friends. That's mitigation to the extent that he has support that could help him be . . . successful on probation, and I think that should be considered in that, rather than as mitigation as to whether or not he can be successful on probation or be rehabilitated, but it . . . should be considered in that factor of whether or not he can be rehabilitated.

And then finally they point out that he's been free from any controlled substances. Certainly the testing in the last month has shown that he's been free. With his physical conditions, I imagine he's been under so much medical care that he[] probably – has more medication now than he did when he was doing it recreationally. So, anyway, I'm not sure . . . how much weight that should give, but it is some mitigation in that at least he hasn't continued in the same substance use that created this incident that we're here for today.

The trial court examined the sentencing considerations pertaining to confinement. It found that neither the first factor, that confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, nor the third factor, that measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant, applied. The trial court then turned to look at the second factor, whether confinement was necessary to avoid depreciating the seriousness of the offense or is particularly suited to provide an effective deterrent to others likely to commit similar offenses. The trial court stated:

Let me address the first part. First, confinement is necessary to avoid depreciating the seriousness of the offense. Now, I have heard that . . . some lawyers . . think that . . my approach is whenever there's a death, that somebody's going to jail, and I can assure you that that is not true. I think that it's very serious, and I obviously have a high value of human life, but there are times that probation is appropriate even when there has been a death, and I've done that. I've given people probation when there's . . . been a death, and so I don't look at this and say automatically confinement is necessary to avoid depreciating the seriousness of the offense.

I think you have to look at the specific facts in that given case, and

[defense counsel] makes some good arguments today about what was going on in [the Defendant's] life at the time, and the [S]tate makes some good arguments too about what led up to that. When I come down to it, though, I look at – you really struggle with this case, as [defense counsel] was saying, with the results of the conduct. You know, the results of the conduct are horrific, and they . . ., to some extent, cry out for justice, but I think you have to look beyond just the results of this but actually at the behavior and so I'm couching my evaluation of this, is confinement necessary to avoid depreciating the seriousness fo the offense, with the behavior that [the Defendant] engaged in on that day. The results are horrific, no doubt about it.

Here's where I come down on his behavior. This was not a situation where [the Defendant] ingested some cold medication and some nausea medication that morning and had a wreck. I certainly think that that is something that can happen to just about anybody. What is significant to me, though, is that before this wreck [the Defendant] had been on methadone for a couple of years, and this is somebody who is . . . continuing to ingest this substance, even though it's one that's less harmful than what he was addicted to, is continuing to engage and ingest this substance that has an effect on . . . his mental processes and his ability to function, and so this is somebody that has a history of this. Even though he did it in the sense of treatment, he's continuing to use this substance, and on top of that, he has these additional things that he probably took innocently that affected him to the extent that he could not even stay awake while driving a car which is what resulted into [sic] these horrific offenses today.

And so when I look at that, I think his behavior leading up, not just that day, but the years leading up to that, create a seriousness here that would be depreciated if I don't give him some form of confinement, and so I think that that . . . factor principle does apply in this case, and the other one, is confinement particularly suited to provide an effective deterrence to others likely to commit similar offenses, and the [S]tate argues that I need to make a statement in Knox County, this happens over and over again, and that's true. I'm not much though on statement sentencing. . . . [I]f somebody needs to make a statement, that needs to come through the legislature . . . .

What I have to look at is this particular case. Is confinement particularly suited to provide an effective deterrence to others likely to commit similar offenses, and I think that is entitled to some weight and some consideration in this particular case, because . . . we've had at least two people I know that have pled guilty today, and one of them I suggested he stick

around and listen to this sentencing hearing, because it is, not just in Knox County, but all over the whole state and the country, behavior that has been repeatedly engaged in, and I don't know that there's anything particularly suited about this community that it's such a huge problem. It's a big problem everywhere, and I think when that problem rises to the level where you take someone's life, then it can be an effective deterrence to others to impose a sentence of confinement. So I think some jail time is warranted in this case.

One of the options the Court has is split confinement where he can be ordered to serve a portion up to a year in local detention, and I'll be honest with you, that's what I've been wrestling over today. I think the facts of this particular case, [the Defendant's] history leading up to what happens to [the victim] requires jail time. My question is, is how much?

An eight-year sentence as range I, [would] be eligible for parole after two and a half years, and [defense counsel] makes some good arguments about whether or not [the Defendant] can function in that environment, and I actually have greater concerns about him in the local detention than I do in the Tennessee Department of Corrections [sic], and so I've weighed through that, what I balance is . . . that enough of an effective deterrence and also will that avoid deprecating the seriousness of the offense and achieve the ends of justice in this case, and I've come to the conclusions that it would not.

So I believe that confinement is necessary in this case. I also . . . believe because of the extensive use of methadone over the years and the inability to get off of that and to continue to drive a vehicle after knowing that he can't stay awake being stopped at a stop light, that split confinement is not sufficient.

And so, [Defendant], I am going to order that you serve this eight years in the Tennessee Department of Corrections [sic]. I am going to recommend the very special needs for [the Defendant]. I think that [defense counsel] raises sufficient argument today to be concerned about [the Defendant's] safety in that community, and I'm going to recommend to the Tennessee Department of Corrections [sic] that he be placed in special needs.

The Defendant appeals this judgment by the trial court.

### C. Motion to Reduce Sentence

After sentencing, the Defendant filed a Rule 35 motion to reduce his sentence, which

he filed under seal.[1]   In the motion, defense counsel noted that the Defendant had not disclosed the impetus to his beginning to abuse drugs in middle school.  After sentencing, the Defendant disclosed that he and three other young men had been victimized by a family member for an extended time period, multiple years, which resulted in significant emotional stress.  The perpetrator of these offenses was charged with multiple counts related to the victimization, resulting in the Defendant having to repeatedly testify and relive these events.  The perpetrator was ultimately convicted and sentenced to a lengthy prison term.

The motion offered scientific research showing that when a child suffers this type of event, or events, the consequences affect the psychological and neurodevelopment of the child.  The defense offered other research correlating this type of childhood trauma with illicit drug abuse.  The Defendant, as a result of the abuse, turned to drugs as a coping mechanism to obliterate his negative feelings.

The motion indicated that the Defendant, at the time of sentencing, still felt so ashamed by what he was forced to endure that he did not share that information with his attorneys.   Defense counsel opined that the Defendant suffered post-traumatic stress disorder.  The motion asserted that the fact of the Defendant's childhood victimization "changes the sentencing dynamics in this case."  Further, it asserted that, had this fact been properly before the trial court at the time of sentencing, the trial court "would have made a different decision."

The trial court denied the Rule 35 motion finding:

> In the [D]efendant's well reasoned and detailed brief, he claims that the court placed great emphasis on the [D]efendant's lengthy drug use in the decision to sentence the [D]efendant to incarceration.  He argues the underlying history leading up to his drug use should be considered as mitigation of this factor in the court's reasoning.  The court agrees that the [D]efendant's history of continued methadone use over a two year period played a significant role in the sentence.  The court further agrees that the decision to incarcerate the [D]efendant was a difficult one.  Counsel for the [D]efendant presented an outstanding argument during the sentencing hearing in favor of a less restrictive sentence.  However, for the following reasons, the court now denies the [D]efendant's request for a reduction in the sentence.

---

[1]This Court denied the Defendant's motion to place his brief containing the facts relevant to this argument under seal.  We ruled that the information contained in this motion could be referred to by the parties in their briefs and during oral arguments.  In respect of the Defendant's desire for privacy, we will attempt to address the information contained in the motion in a cursory and general manner.

The [D]efendant's history of drug abuse was not the only factor weighing in favor of incarceration in the court's decision making process. Besides the tremendous devastation in the loss of life, the court was struck by the [D]efendant's knowledge on the day of the accident that the substances he had ingested were preventing him from driving safely. Knowing he could not stay awake, he continued to drive. This conscious choice on the day of the accident weighed greatly in the court's decision. Furthermore, the [D]efendant chose not to reveal his history of victimization to his counsel prior to the sentencing hearing. This is not a situation where newly discovered evidence has been uncovered.

The Advisory Commission Comments to Rule 35 state, "[t]he intent of this rule is to allow modification only in circumstances where an alteration of the sentence may be proper in the interests of justice." Although the sentence of incarceration was a narrow and difficult decision for the court, the court is of the opinion that the evidence concerning the [D]efendant's history of [victimization] would not have made a difference in its ultimate ruling. Therefore, the interests of justice do not require a reduction of the sentence in this case.

The Defendant also appeals this judgment.

## II. Analysis

On appeal, the Defendant contends that that the trial court erred when it denied him an alternative sentence and ordered his sentence to be served in confinement. He further contends that the trial court erred when it denied his Rule 35 motion to reduce his sentence.

### A. Alternative Sentence

The Defendant asserts that his incarceration is "inconsistent with the purpose and principles of the Tennessee Sentencing Reform Act of 1989 and the 2005 amendments thereto." He argues that his sentence of confinement was not necessary to provide an effective deterrent, according to the relevant statute. The Defendant contends that the trial court's ruling makes a "clearly erroneous assessment of the evidence to the extent it is based on evidence deduced below or relies upon evidence that was simply never presented." He asks this Court to conclude that the trial court abused its discretion and to reverse the trial court's judgment.

The State counters that our review is limited according to recent case law and that the

trial court's judgment is "presumptively reasonable." *See State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). The State notes that the trial court considered the relevant evidence and set forth the reasons for the Defendant's sentence. The State asserts that we should, therefore, affirm the Defendant's sentence.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Recently, our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *Caudle*, 388 S.W.3d at 278-79. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2012); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of

the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

In this case, after much consideration, the trial court based its denial of an alterative sentence on factor two, that confinement was necessary to avoid depreciating the seriousness of the offense or confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. The trial court found that there was a need for deterrence, giving that consideration "some weight," and found that confinement was necessary to avoid depreciating the seriousness of the offense. The trial court highlighted the fact that the Defendant chose to drive after ingesting substances that he knew would make him sleepy and that he chose to drive after falling asleep at a stop light. After making this choice, he again fell asleep while driving, hitting and killing a mother of three who was on her way to work.

The trial court considered the pertinent facts of this case and appropriate sentencing principles. The trial court denied alternative sentencing based on the nature of the offense and to avoid depreciating the seriousness of the offense. The Defendant has not established that the trial court abused its discretion by denying him an alternative sentence.

The Defendant specifically argues that the trial court based its decision on deterrence alone, and so it should have considered additional factors enumerated in *State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). We disagree. The trial court based its denial on both the nature of the offenses and the necessity to avoid depreciating the seriousness of the offense. Therefore, the court was not required to consider the factors discussed in *Hooper*. *Hooper*, 29 S.W.3d at 10, 11 (holding that a denial of an alternative sentence may be "based solely on a need for deterrence" under certain circumstances.). The trial court did not abuse its discretion, and its failure to mention each of these factors is not a basis for reversal by this Court. *See State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The Defendant is not entitled to relief on this issue.

**B. Rule 35 Motion to Reduce Sentence**

The Defendant next contends that the trial court erred when it denied his Tennessee Rule of Criminal Procedure 35 motion to reduce his sentence. In his motion the Defendant offered evidence that his drug use was a coping mechanism developed as a result of suffering severe abuse at the hands of a family member. The Defendant notes that his intoxication was not the result of a desire to pursue personal pleasure. Further, he states that he is a good candidate for rehabilitation. The State counters first that the Defendant waived this issue by failing to specifically address Rule 35 in his brief. Further, the State asserts that the issue is without merit because Rule 35 does not vest the Defendant with a remedy as of right and that the Defendant has failed to show that the trial court abused its discretion in denying the motion.

Tennessee Rule of Criminal Procedure 35 provides that:

(a) Timing of Motion. The trial court may reduce a sentence upon motion filed within 120 days after the date the sentence is imposed or probation is revoked. No extensions shall be allowed on the time limitation. No other actions toll the running of this time limitation.

(b) Limits of Sentence Modification. The court may reduce a sentence only to one the court could have originally imposed.

(c) Hearing Unnecessary. The trial court may deny a motion for reduction of sentence under this rule without a hearing.

(d) Appeal. The defendant may appeal the denial of a motion for reduction of sentence but shall not be entitled to release on bond unless already under bond. If the court modifies the sentence, the state may appeal as otherwise provided by law.

This rule does not "vest the defendant with a remedy as of right." *State v. Elvin Williams*, No. M2006-00287-CCA-R3-CO, 2007 WL 551289, at *1 (Tenn. Crim. App., at Nashville, Feb. 22, 2007), *no Tenn. R. App. P. 11 application filed*. The Advisory Commission Comments to Rule 35 explain that "[t]he intent of this rule is to allow modification only in circumstances where an alteration of the sentence may be proper in the interests of justice."

Our Supreme Court has explained that "appeals from Rule 35 motions to reduce sentences are separate and distinct from appeals seeking review of the original judgment, including the sentence imposed [in that the] denial of a Rule 35 motion is not the equivalent

of imposing a sentence but simply reaffirms the sentence previously imposed." *State v. Ruiz*, 204 S.W.3d 772, 777 (Tenn. 2006). This Court examines Rule 35 motions to reduce sentences under an abuse of discretion standard. *Id.*; *State v. Irick*, 861 S.W.2d 71, 75 (Tenn. Crim. App. 1993). The trial court abuses its discretion "only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *Ruiz*, 204 S.W.3d at 778. The purpose of the rule is "to allow modification in circumstances where an alteration of the sentence may be proper in the interest of justice." *State v. Hodges*, 815 S.W.2d 151, 154 (Tenn. 1993).

The Defendant asserts that, because of the revelation of his past history, which was the cause of his original drug use, his sentence of confinement should be altered. The trial court reviewed the evidence and the Defendant's motion and concluded that this history did not change the facts presented at the sentencing hearing. Those facts included that the Defendant chose to use substances in combination with methadone that he knew would make him sleepy, that he continued to drive even after falling asleep and waking at the wheel, and that he again fell asleep while driving, crossed over the center line, and killed the victim. The trial court, while sympathetic to the Defendant's past, ultimately ruled that the interests of justice did not necessitate a sentence reduction. After our review, we conclude that the trial court did not abuse its discretion in this regard. The Defendant is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court did not abuse its discretion when it sentenced the Defendant or when it denied his Rule 35 motion to reduce his sentence. Accordingly, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

-16-